```
                                                          Page 1
 1           IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF ALASKA
 3  _____

    SCOTTSDALE INSURANCE            )
 4  COMPANY,                        )
                                    )
 5          Plaintiff,              )
                                    )
 6      vs.                         )
                                    )
 7  USANEE ASSAVAPISALBOOL and      )
    LOUISA SKIPPER,                 )
 8                                  )
            Defendants.             )
 9  _____)
    Case No. A05-101 CIVIL (TMB) CI
10
11

12  _____

         DEPOSITION OF USANEE ASSAVAPISALBOOL
13  _____
14
                    Pages 1 - 58
15          Wednesday, March 1, 2006
                    9:29 A.M.
16
            Taken by Counsel for Plaintiff
17                     at
         SANDBERG, WUESTENFELD & COREY, PC
18        701 West 8th Avenue, Suite 1100
               Anchorage, Alaska
19
20
21
22
23
24
25
```

```
                                                                    Page 2
 1                       A-P-P-E-A-R-A-N-C-E-S
 2
     For Plaintiff:
 3      Mark A. Sandberg
        SANDBERG, WUESTENFELD & COREY
 4      701 West Eighth Avenue, Suite 1100
        Anchorage, Alaska 99501
 5      907/276-6363
 6
     For Louisa Skipper:
 7      Frank J. Schlehofer
        David W. Murrills
 8      WILLIAM G. AZAR, PC
        800 East Dimond Boulevard, Suite 3-440
 9      Anchorage, Alaska 99515
        907/344-3434
10
11
     For Defendants:
12      Blake H. Call
        CALL HANSON & KELL, PC
13      250 H Street
        Anchorage, Alaska 99501
14      907/258-8864
15
     Interpreter:
16      Sean Saengthip
        LLE-LINK
17      1627 K Street Northwest, Suite 610
        Washington, D.C. 20006
18      1-888/464-8553
19
     Court Reporter:
20      Lisa L. Shaffer
        PACIFIC RIM REPORTING
21      711 M Street, Suite 4
        Anchorage, Alaska 99501
22
23
24
25
```

```
                                                                    Page 3
 1                           I-N-D-E-X

 2
    EXAMINATION BY                                                  PAGE
 3
       Mr. Sandberg                                                    5
 4
       Mr. Schlehofer                                                 27
 5

 6

 7
    EXHIBITS                                                        PAGE
 8
       1     Complaint (8 pgs.)                                       24
 9
       2     3/28/05 Letter written by U. Assavapisalbool             24
10           (9 pgs.)

11
       3     Response to Plaintiff's Discovery Request                31
12           (1st) to Defendant Usanee Assavapisalbool
             (3 pgs.)
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1  ANCHORAGE, ALASKA; WEDNESDAY, MARCH 1, 2006
2  9:29 A.M.
3  -oOo-
4  MR. SANDBERG: Let me begin. Since we don't
5  have a resume from you or anything, if you may, would
6  you simply describe to us your background and your
7  ability to service as our translator today.
8  INTERPRETER: Yes. I am an on-call
9  interpreter for LLE-Link Administration that is here
10 based in Washington, D.C. And I've been translating
11 for the past eight years, both in person and by phone.
12 I've been doing a lot of depositions in the past, but
13 this is my first time doing it by phone, so I don't
14 know how different it's going to be.
15 MR. SANDBERG: But you have served as an
16 interpreter during depositions previously?
17 INTERPRETER: Yes.
18 MR. SANDBERG: And roughly, ballparking, how
19 many times have you done that?
20 INTERPRETER: Oh, the last eight years, I
21 think probably at least a hundred times.
22 MR. SANDBERG: Okay.
23 Does anyone else want to ask Sean something
24 before we start?
25 MR. SCHLEHOFER: Just a couple of questions.

Page 5

1  I assume that was a translator in Thai
2  language only?
3  INTERPRETER: Yes, it's in Thai.
4  MR. SCHLEHOFER: And just tell the court
5  reporter your address and phone number, so that if we
6  have to get ahold of you, we can.
7  INTERPRETER: Sure. Our address is 1627
8  K Street Northwest, Suite 610, Washington, D.C.,
9  20006. Phone number: 1-888-464-8553.
10 MR. SCHLEHOFER: Thank you.
11 Mr. Sandberg?
12 MR. SANDBERG: Great. We're going to begin
13 the deposition now.
14 INTERPRETER: All right.
15 -oOo-
16 (Interpreter sworn.)
17 USANEE ASSAVAPISALBOOL,
18 deponent herein, being sworn on oath,
19 was examined and testified as follows:
20 EXAMINATION
21 BY MR. SANDBERG:
22 Q  What is your name?
23 A  Usanee Assavapisalbool.
24 Q  Where do you live?
25 A  Barrow, Alaska.

Page 6

1  Q  How long have you lived there?
2  A  About five and a half years.
3  Q  How long have you lived in the United States?
4  A  Ten years.
5  Q  Are you an American citizen?
6  A  No.
7  Q  Where do you work?
8  INTERPRETER: Did you say "where"?
9  MR. SANDBERG: Where.
10 A  In Barrow.
11 BY MR. SANDBERG:
12 Q  What is your job?
13 A  A taxi driver.
14 Q  Who do you work for?
15 A  Arctic Cab.
16 Q  Who owns Arctic Cab?
17 A  The owners are Mr. and Mrs. Kim.
18 Q  How long have Mr. and Mrs. Kim been the
19 owners?
20 A  I don't know for sure, but about -- probably
21 about 20 years.
22 Q  Was Mr. Amornrit ever the owner?
23 A  No. He was not the owner of the company, he
24 was the owner of the car which I drove.
25 Q  Is that the 2000 Honda?

Page 7

1  A  The Honda CRV, year 2000.
2  Q  Mr. Amornrit owned the Honda?
3  A  Yes, that's correct.
4  MR. CALL: You don't need to lean into the
5  mic. He will hear you okay from there, I think, as
6  long as you keep your voice up.
7  BY MR. SANDBERG:
8  Q  Did Mr. Amornrit own more cabs than just the
9  Honda?
10 A  This is the only car that he own. He was my
11 ex-boyfriend and he was moving out of town, and so he
12 sold his vehicle to me. But because of my credit, I
13 asked him to use his name, because I lack credit.
14 Q  So in 2003 Mr. Amornrit still owned the
15 Honda?
16 A  Yes. The name -- the title is still under
17 his name.
18 Q  In 2003 did anyone except you drive the
19 Honda?
20 A  Nobody else.
21 Q  Had you paid Mr. Amornrit anything to buy the
22 Honda before 2003?
23 INTERPRETER: Can you repeat that for the
24 interpreter, please?
25 MR. SANDBERG: Yes.

Page 8

1  BY MR. SANDBERG:
2  Q  Did you pay anything to own the Honda before
3  2003?
4      MR. SCHLEHOFER: Let me just object for
5  foundation. The question sort of presupposes or
6  implies that she owned the Honda before that.
7      Go ahead. That's just for the court
8  reporter.
9  A  I paid it with cash in the amount of $4000,
10 and I made a payment thereafter from my bank account.
11 The bank is still under his account, but I was the one
12 who made the payments for the vehicle.
13 BY MR. SANDBERG:
14 Q  To whom did you pay $4000?
15 A  To Amornrit.
16 Q  When did you pay $4000?
17 A  Two months before he moved out of the town.
18 Q  When did he move out of Barrow?
19 A  I'm not certain of an exact date, but it
20 should be after March 10th or so.
21 Q  Of 2003?
22 A  Yes, that's correct.
23 Q  Do you know where Mr. Amornrit lives now?
24 A  I don't have any contact with him since the
25 last time, and I don't have his phone number.

Page 9

1  Q  Do you believe he has left the United States?
2  A  I don't think he has moved out of the U.S.,
3  but for sure he changed his cell phone number and his
4  home phone number, and I don't know why.
5  Q  Do you know any town Mr. Amornrit lived in
6  after Barrow?
7  A  He moved to Oakland, near San Francisco.
8  Q  Was there any written agreement to sell the
9  Honda to you?
10 A  No.
11 Q  Who owns the Honda today?
12 A  After, this Honda was involved in an auto
13 accident and it was proclaimed total loss.
14 Q  Was there insurance for that accident?
15 A  It's Scottsdale. And if I remember
16 correctly, it happened around November of 2003.
17 Q  Did she say Scottsdale?
18 A  Yes.
19 Q  Did the insurance pay you or Mr. Amornrit?
20 A  If I remember correctly, it was made to both
21 myself and Amornrit. And Amornrit signed his
22 signature on the back, and the check was deposited
23 into my bank, my account.
24 Q  I would like to ask about the incident on
25 April 29th, 2003.

Page 10

1  A  Okay, yes.
2  Q  Did you know Louisa Skipper?
3  A  Yes, I do.
4  Q  How did you know Louisa?
5  A  The person was my customer.
6  Q  Had you driven Louisa before?
7  A  Yes.
8  Q  Had you ever had an argument with Louisa
9  before?
10 A  No, never.
11 Q  Tell us what happened that day, and then
12 we'll take it in smaller segments.
13 A  Yes, I can.
14 Q  Please do.
15    (Witness responding.)
16    INTERPRETER: I ask her to pause so I can
17 relate to you in English more clearly.
18    MR. SANDBERG: Thank you.
19 A  That day the customer called to the company,
20 and it was my turn to go and pick up the customer.
21 And as I went there, I waited. And the customer
22 needed to stop at Alaska Air Cargo, and that's where
23 they needed to stop, the customer needed to stop.
24    And I had to drive to the place where they
25 did fishing. And then after that, I had to drive to

Page 11

1  the bank.
2     INTERPRETER: Okay. I relay to you
3  incorrectly. Let me repeat that again.
4  A  So after I picked up the customer, they had
5  to go to the Alaska Cargo, and that's where they -- to
6  pick up fishing line -- a fishing pole.
7     I waited in the car for about five minutes.
8  And after five minutes, the person came back out to
9  the car and then they said they need to go to the
10 bank.
11    And after that, the customer went to the bank
12 and they went to the counter. I waited in the car.
13 I'm not sure how long I waited. After that, the
14 customer came out. I drove the customer home.
15 Usually a round-trip with one stop, we charge $7.
16    So the customer gave me $5 into my right hand
17 as I was driving slowly. And I told the customer it
18 was $7 was the charge, because it was a round-trip
19 with one stop. But the customer said it was a local
20 two-stop, which is $5. But the customer
21 misunderstood. It was not a local two-stop; rather,
22 it was a round-trip one-stop, which we charge $7.
23    And I relay that to the customer, and the
24 customer said no, it was $5, that's what he used to
25 pay, he said. And so I said no, it was seven. And

5 (Pages 8 to 11)

Page 12

1  after that, he began to -- the customer began to raise
2  voice, arguing that it was $5.
3      And so as we were going slowly -- at that
4  time the car was moving about one mile per hour -- and
5  the money was in my right hand. And so the customer
6  grabbed the money back to himself --
7      MR. SANDBERG: Sean, it is a lady we're
8  discussing. It's herself.
9      INTERPRETER: Okay. In Thai it can be both.
10  A  So she grabbed the money back, and so I
11  grabbed the money and put it on the counter. And I
12  asked her how old she was, and she said 62. And I
13  said, well, for an age to get a senior citizen's
14  discount, she has to be 65. With an age of 62, she
15  could not pay only $3.
16      So I explain that 62, the total charge for
17  the round-trip with one stop would be $11. And when
18  she heard that, she was upset and she said she used to
19  pay the amount that she -- this amount before. And so
20  she referred to her daughter, that her daughter used
21  to -- and can be a witness, I guess, testify to that,
22  who worked at City Hall. And so I asked the customer
23  to call the daughter.
24      She was upset because I told her and I talked
25  to her that way. Usually most of our taxi drivers are

Page 13

1  male. I was probably the only female driver at that
2  time.
3      So because of that, most of the male drivers
4  probably let it go, without arguing with her. But I
5  was telling her how much the charge really was. And
6  she was upset and she was trying to force or make
7  me -- trying to create circumstances or make me leave
8  the city.
9      MR. SANDBERG: Is that the end of the answer
10  so far, Sean?
11  A  So after that, as I was going slowly, we were
12  approaching, getting closer to her house, her place.
13  And as we were getting closer, I was still going
14  slowly.
15      Before her house, there was a place called
16  Boy and Girls Club. And in front of there, there was
17  a police car, police, that was out there. And as we
18  were driving by, I thought to myself maybe I should
19  ask the officer to help me.
20      But as the car was passing by that place,
21  she, the customer, opened the door, which caused an
22  alarm to sound. And when the alarm sound, I
23  reached -- I stretched out my right hand and grabbed
24  her shirt or her coat by the shoulder. It was a thick
25  coat. It was made of some kind of local material, a

Page 14

1  thick animal skin or fur. A thick coat.
2      And when I -- and I stopped at that moment.
3  And when I stopped, she grabbed on her fishing
4  supplies that she bought, and she just walked out.
5      So after that, the lady -- or the customer
6  walked out and walked toward her place. It was not
7  very far. Probably about 26 steps before she reached
8  her house. And so I thought to myself, well, I need
9  to talk to the officer. Maybe they can help.
10      So I went back to where the police car was
11  and I found the officer and explained to the officer
12  the situation. And some of the fishing supplies were
13  still in the car.
14      And the police officer came with me to the
15  front of her house. And then she came down from --
16  came out from her house, and she started to -- the
17  policeman or the police officer went and talked to
18  her. She was wearing like a white T-shirt. It didn't
19  seem like there was a sign of pain or any sort.
20      So she was screaming or talking loudly to the
21  officer, and she asked for the phone number for the --
22  to call to complain to the City Hall. So yes, she
23  called the city -- excuse me, it's City Hall. I heard
24  it wrong.
25      So she asked for the number for the City Hall

Page 15

1  to call so she could make a complaint against the taxi
2  driver.
3      So that day ended. And the next day, about
4  between 12:00 or 1:00 in the afternoon, the people
5  from the City Hall called and asked me to come in and
6  talk to one of the -- talk to them.
7      And I came in. And they told me that the
8  customer had called, made a complaint against me,
9  because I caused the customer's shoulder bruises. And
10  they said that she had to go into the hospital because
11  of the bruises on her shoulder. And they also told
12  me, they said: This is your first warning, and that's
13  all that I have to say.
14      Okay. The person who called or who talked to
15  me at the City Hall, his office -- his title, I guess,
16  is the director of taxicabs.
17      I have nothing else. Thank you.
18  BY MR. SANDBERG:
19  Q  Were you driving the Honda that day?
20  A  Yes.
21  Q  Was the fishing rod in a case?
22  A  No. It was just regular fishing supply, and
23  it was set right in the middle of the seat.
24  Q  How long was the fishing rod?
25  A  I don't know, but probably about 1.5 meters.

Page 16

1  Q  Was it in several pieces?
2     INTERPRETER:  Can you repeat that for the
3  interpreter?
4     MR. SANDBERG:  Yes.
5  BY MR. SANDBERG:
6  Q  Were there several pieces to the fishing rod?
7  A  No. It was just a one-piece.
8  Q  How much money did the customer give you the
9  first time?
10 A  $5.
11    INTERPRETER:  In regards to this case?
12    MR. SANDBERG:  Yes.
13 A  $5.
14 BY MR. SANDBERG:
15 Q  What did you do with the $5 when the customer
16 gave it to you?
17 A  I was holding it on my right hand -- in my
18 right hand.
19 Q  Was the customer in the front seat?
20 A  Yes.
21 Q  Did the customer take the money from your
22 hand?
23 A  Yes.
24 Q  Was that before the alarm went off?
25 A  Which alarm are you referring to?

Page 17

1  Q  I thought you said an alarm went off when the
2  customer tried to get out of the car.
3  A  Yes, it was before.  When I refer to the
4  alarm or the noise, I was referring to, in Hondas,
5  when you open the door or when the door is not shut
6  tight, you'll hear a noise.
7  Q  A buzzer?
8  A  I don't know what to call it, but you know
9  when you open the door, you'll hear a noise.  I don't
10 know how to word that.
11 Q  The car makes the noise?
12 A  Okay.  The noise that I am referring to is
13 the noise when, before you get out of the car, you
14 hear a cracking noise.  That's what I was referring
15 to.
16    MR. SCHLEHOFER:  Are you tape-recording this?
17 I assume you are.  Okay, I want to preserve a copy of
18 the tape, and actually get a copy.
19    I'm sorry, Mark.  Go ahead.
20 BY MR. SANDBERG:
21 Q  After you heard the noise, you grabbed the
22 customer's coat?
23    INTERPRETER:  Can you repeat that for me,
24 please?
25    MR. SANDBERG:  Yes.

Page 18

1  BY MR. SANDBERG:
2  Q  After you heard the noise, did you grab the
3  customer's coat?
4  A  Okay.  I am not certain exactly where my hand
5  was placed on the customer, because when I -- because
6  at that time, the car was still moving.  And because I
7  heard the clicking sound of the door, I was --
8  instantaneously stretch out my hand, my right hand, to
9  grab or to get ahold of the customer.  But I wasn't
10 sure where I placed my hand, whether it was on the
11 shoulder or on the arm.
12 Q  Did you grab the customer's coat?
13 A  I probably -- well, I -- for sure, I grabbed
14 the coat, because it was such a big coat.  I believe
15 that it was made out of like bear fur on the back
16 side, and on the outer side it was made out of some
17 kind of material that was thick.  Very thick.
18 Q  Why did you grab the coat?
19 A  Because I was afraid that the customer might
20 open the door and walk out or go out of the car while
21 the car was still running.  I've never had a customer
22 who had done this in the past.
23    And because we were still talking and trying
24 to communicate, the car was going very slow.
25 Q  Did you stop the car?

Page 19

1  A  As soon as I grabbed ahold of the coat of the
2  customer, I stopped right away and the customer walked
3  out of the car.
4  Q  Did you let go of the coat?
5  A  Yes, for sure, because I had to release my
6  right hand so that I can change the gear on the car to
7  park.
8  Q  When the customer got out of the car, was the
9  fishing rod still inside?
10 A  Yes.
11 Q  Did the customer come back for the rod?
12 A  No.  She walked straight to her place.  And
13 then I returned and got the officer, like I told you
14 earlier.
15 Q  Did you and the customer ever struggle over
16 the rod?
17    INTERPRETER:  Let me ask her to repeat that
18 for me.
19 A  Okay.  So when the customer was opening the
20 door, I thought to myself that it was strange that she
21 did that, and -- because one hand she got ahold of the
22 door handle, and the other hand she was putting her --
23 putting on her fishing rod.  And so I thought she
24 was -- it was strange that she would do that.  And so
25 I placed my hand on top of the rod, and then she

Page 20

1  looked at me and she just walked away and shut the
2  door very hard.
3      Q   Why did you place your hand on the rod?
4      A   Because I want to make it clear or
5  communicate to her clearly, so that I can drop her off
6  in front of her house. But she would not listen.
7          And since I've been a taxi driver, I've never
8  had anybody who get out of the car before I reach the
9  front of their house.
10     Q   Did you keep the rod to make certain you got
11 paid?
12         INTERPRETER: Can you repeat that for the
13 interpreter, please?
14         MR. SANDBERG: Yes.
15 BY MR. SANDBERG:
16     Q   Did you keep the rod to make certain you got
17 paid?
18     A   No, I didn't think that, because if that
19 happened, then I know that she would call to City Hall
20 and I would get punished or I would be -- have to go
21 into City Hall and clear things up. And she also have
22 the right to call the police.
23     Q   Did the customer pay you anything for this
24 rod?
25         INTERPRETER: Can you repeat that for the

Page 21

1  interpreter, please?
2      Q   Did the customer pay you anything for this
3  rod?
4      A   Can you state that again? Because she did
5  pay me $5 for the service, for the taxi service, but
6  how does that relate to the fishing rod?
7          MR. CALL: If I could help.
8          MR. SANDBERG: Please.
9          MR. CALL: When the customer left the cab,
10 where was the $5?
11         THE WITNESS: In the car I had it.
12 BY MR. SANDBERG:
13     Q   So the customer had given you $5, taken it
14 back, and then given it to you once again?
15     A   No. Well, not momentarily. This is what
16 happened: My left hand was on the steering wheel.
17 She gave me the $5 into my right hand. I held it in
18 my right hand, and she took it back. And when she
19 took it back, I took it back from her and left -- and
20 placed the money on the counter -- or on the deck.
21         MR. CALL: The dashboard.
22         INTERPRETER: The dashboard.
23 BY MR. SANDBERG:
24     Q   How did you take it back from the customer?
25     A   Because she grabbed it out of my right hand,

Page 22

1  I just used my right hand and took it back.
2      Q   Did you touch the customer when you took it
3  back?
4      A   I don't think so. Probably only the tip of
5  her fingers.
6      Q   Have you talked to this customer since April
7  29th, 2003?
8          (Witness answering question.)
9          INTERPRETER: Let me ask her to pause there
10 so I get it clearly.
11     A   Yes. Since April 2003, I did not have
12 contact with the customer again until the beginning of
13 last year. And at that time, there were many people
14 that came into town, probably around -- I don't
15 remember the exact amount of people, but there were
16 probably about 2500 people that came into Barrow.
17         So at that time, because there were many
18 people in town from out of town, us, as taxi drivers,
19 we were very busy, because we had to -- many people
20 needed taxi service.
21         So as I was driving to pick up my customer, I
22 saw the lady again standing in front of the AC store
23 with her husband and a friend of her husband.
24         And I saw her standing there for a while.
25 And I had a customer that needed a ride who was

Page 23

1  waiting in -- who was at the AC store, and so I went
2  there to pick up my customer. And as I parked, as
3  soon as I parked, that same lady went into the car, to
4  the front seat, and her husband with his friend came
5  into the back seat. And her husband told me to go and
6  stop at the post office.
7          So when we got to the post office, her
8  husband had to run down and he went inside to the --
9  into the post office. And I was in the car with her,
10 and so I show her the meter and explain to her that in
11 order to get a senior citizen's discount, she has to
12 be 65 and she take note of that. And then her husband
13 came back into the car, and then I dropped them off at
14 their house.
15         I apologize. It was not the meter that I was
16 referring to, it was a paper I printed out it was
17 allowed -- it was permitted by the City Hall of the
18 rate that -- of the taxi rates. And it say that in
19 order for the customer to be qualified for a discount,
20 a senior citizen's discount, the customer has to be 65
21 or older. And so I show that to her. That's the
22 paper that I showed to her.
23         And so after that, when her husband came back
24 into the car from the post office, I dropped them off
25 at their house. And shortly after that, I received a

Page 24

1  letter from the attorney.
2      And that's all.
3      (Exhibit Nos. 1 and 2 marked.)
4  BY MR. SANDBERG:
5    Q  Do you see we've given you a paper with No. 1
6  written on it?
7    A  Yes.
8    Q  Is this the letter from the attorney?
9    A  Yes, that's correct.
10   Q  What is No. 2?
11   A  It is the letter that I wrote to explain
12 that -- I explain in Thai, and I had to ask a friend
13 to translate it to English, because my English skills
14 are not very good.
15     But I wasn't sure if I would have money to
16 pay for attorney fees.  So I just wanted to end the
17 whole thing, end the case, because of finance issue.
18 And the paper was turned in to the court there in
19 Barrow.
20   Q  Who is the friend who typed this?
21   A  The person who did this ask that my name
22 should not be revealed, because the person does not
23 want to be involved with this case.  And so the person
24 asked me to be known as anonymous.
25     MR. CALL:  He doesn't want to get threatened

Page 25

1  with banishment from Barrow.
2  BY MR. SANDBERG:
3    Q  Do you believe that this letter truthfully
4  tells what happened?
5    A  And on that day, I believe it was the 10th,
6  the last day to turn in the paper to the court, the
7  letters to the court, and so the friend did that for
8  me.
9      But after, after the papers were given to the
10 court, I sat down and I review or read the
11 translation.  There was a couple of mistakes on there
12 that I wish to state to you.
13     There is, first of all, the letter state that
14 the customer did not pay $5, but indeed the customer
15 did pay $5.
16     And the second thing is that this letter said
17 it was -- the letter didn't mention a round-trip with
18 one stop.
19     COURT REPORTER:  Did or did not mention?
20     INTERPRETER:  Did not.
21   A  So the translator or the person who
22 translated the letter for me, or who typed the letter
23 for me, tried to explain, but it was -- there was a
24 little miscommunication or mistake.
25 ///

Page 26

1  BY MR. SANDBERG:
2    Q  With those corrections, do you believe the
3  letter truthfully tells what happened?
4      INTERPRETER:  I'm afraid I'm lost in this.
5    A  Okay.  Truthfully, yes.
6      In the letter, I also explain that when I
7  find of hers a wallet, I usually return to the
8  customer.  Many times I've found loose wallets or
9  purses.  And one time there was about $200 and I had
10 returned it to the customer.  And usually, even if
11 they want to pay me because I return it to them, I
12 usually don't accept it.
13     Usually -- she was explaining to the
14 interpreter -- that the purse or the wallet was found
15 not in the car, but outside of the car.  And the
16 letter mentioned that in front of AC store there was a
17 purse found.  And it was not in the car, it was in the
18 cart, in the shopping cart from that store.
19     And that I turned that in to my boss, and my
20 boss called the customer, who happened to be a Native
21 American.  And they got their money back, and they
22 also sent some reward money to reward the founder of
23 that purse, of that wallet.  And I did not accept
24 that, because that did not belong to me.
25     And from that lady, from the trip from her

Page 27

1  house -- or a trip to the post office, a round-trip to
2  the post office with one stop, there is a charge of
3  $6, but she only gave me 4.  And she done that to many
4  of my co-taxi drivers, and they did not say much about
5  it.
6      But she called into the company and made a
7  complaint.  And the company, the personnel of the
8  company, explained to her that the charge was correct.
9      I have nothing else.
10   Q  Is this your signature at the bottom of the
11 letter?
12   A  Yes, that is correct.
13     MR. SANDBERG:  I have no more questions, but
14 perhaps some of these other people do.
15     THE WITNESS:  Okay.
16     MR. CALL:  Off record.
17     (Off the record.)
18     MR. SCHLEHOFER:  Back on record.
19         EXAMINATION
20 BY MR. SCHLEHOFER:
21   Q  Hi.  I'm Frank Schlehofer.  I'm the attorney
22 for Mrs. Skipper, and I will be asking you some
23 questions.
24     MR. SCHLEHOFER:  Go ahead, please.
25     INTERPRETER:  Hi.  I cannot hear you very


Exhibit 2
Page 9 of 17

Page 28

1  well.
2      MR. SCHLEHOFER: I'll repeat that.
3      INTERPRETER: Maybe move closer to the
4  telephone.
5  BY MR. SCHLEHOFER:
6   Q  Hi, I'm Frank Schlehofer. I'm the attorney
7  for Mrs. Skipper, and I will be asking you some
8  questions.
9   A  Yes.
10  Q  How long have you been a taxicab driver?
11  A  (In English) Five and a half year.
12     INTERPRETER: Five and a half years. That
13  was in English.
14  Q  Where did you start driving a taxi?
15  A  In the year 2000.
16  Q  Okay. Where did you first start driving a
17  taxi?
18  A  In Barrow.
19  Q  Have you ever been arrested for anything?
20  A  No, never.
21  Q  Have you ever lived in Anchorage?
22  A  No, never.
23  Q  Your ex-boyfriend, did he ever live in
24  Anchorage?
25  A  No, never.

Page 29

1   Q  And what's his name? I can't pronounce it.
2  Amornrit?
3   A  His name is Songpol Amornrit.
4   Q  Do you know if Songpol purchased insurance
5  for the taxicab business in Barrow or in Anchorage?
6      MR. CALL: Objection to the form of the
7  question.
8   A  I don't know if the -- we had to go through
9  an agent, and I don't know if the agent is in
10  Fairbanks or in Anchorage. It's called Baker
11  Association, if I remember correct.
12     MR. SCHLEHOFER: What was your form
13  objection?
14     MR. CALL: Well, you asked whether she bought
15  it in Anchorage or Barrow. There are other towns in
16  Alaska, and part of the disclosure is -- from
17  Scottsdale, is Baker & Associates on Cushman Street in
18  Fairbanks.
19  BY MR. SCHLEHOFER:
20  Q  Okay. So there was some contact with an
21  agent in Fairbanks; is that right?
22  A  According to the paper, it says Fairbanks.
23  Q  So there was no contact by Songpol or you
24  with an insurance company in Anchorage; is that
25  correct?

Page 30

1   A  No. We only contact -- the person that we
2  only contact is our agent.
3   Q  We talked about a Honda CRV.
4   A  Yes.
5   Q  Did Songpol have any other type of -- own any
6  other type of Honda?
7   A  No. Just this one vehicle.
8   Q  You had talked about he had sold a vehicle
9  before he moved. What type of vehicle was that?
10  A  It's a 2000 Honda CRV, blue in color. The
11  kind that is probably the base of that model. It did
12  not have a CD player.
13  Q  Was that the Honda involved in this incident
14  on April 29th, 2003?
15  A  Yes, that's correct.
16  Q  I'm a little bit confused. Was there another
17  Honda -- what was the -- let me rephrase that.
18     Was there another vehicle that Songpol owned
19  before this incident on April 29th, 2003?
20  A  As far as the Honda is concerned, this Honda
21  is the only Honda that we had.
22     Prior to that, we had a Suzuki and we had --
23  I don't remember if the vehicle was registered under
24  my name or Songpol's name. But we had it -- and we
25  had insurance on it about six months, or half a year,

Page 31

1  but that car was also sold.
2      As far as the Honda is concerned, this Honda
3  is the only Honda that we have had.
4      MR. SCHLEHOFER: I'll show her Exhibit 3.
5      (Exhibit No. 3 marked.)
6  BY MR. SCHLEHOFER:
7   Q  Going to the second page, is that your
8  signature?
9   A  Yes.
10  Q  So is Exhibit 3 your statement under oath
11  that this was the Honda that you were in on April
12  29th, 2003 with Ms. Skipper?
13  A  Yes, correct.
14  Q  Did Scottsdale -- did you ever talk to
15  Scottsdale Insurance Company?
16  A  In regards to what? Which matter?
17  Q  This incident with Mrs. -- on April 29th,
18  2003 with Mrs. Skipper.
19  A  Four to five months after the incident on
20  April 29th, I received a letter from Scottsdale
21  Insurance and they ask me whether I was involved in
22  any kind of auto accident or if I ran over anybody's
23  property or injured anybody.
24     And at that time, I didn't remember any
25  incident which I caused anybody -- I cause anybody


Exhibit 2
Page 10 of 17

Page 32

1  problems in regards to the vehicle.
2      Q   Did Scottsdale know that Thai -- that you
3  spoke Thai?
4      A   I don't think they know, because when I
5  contact them -- or when we contact them, we used
6  English. But it wasn't clear. I don't know if they
7  know where I came from.
8      Q   If Scottsdale wanted to talk to you about
9  this April 29th, 2003 incident, with a Thai
10 interpreter, would you have done that?
11     A   Yes.
12     Q   And did Scottsdale ever tell you that they
13 were saying that there might not be insurance coverage
14 for this April 29th, 2003 incident?
15     A   I don't know if I understood it clearly, but
16 my coverage doesn't cover any kind of arguments
17 between -- arguments with -- or problems with
18 customer.
19     Q   Is that your guess, that the coverage
20 doesn't -- that there is not insurance coverage, or do
21 you know that? Why do you say that?
22     A   I thought I understood it to be that way, so
23 that has been my understanding from what I understood
24 from what was explained to me.
25     Q   And who explained that to you?

Page 33

1      A   I don't remember who explain it to me.
2      Q   Was that after the April 29th, 2003 incident?
3      A   Yes.
4      Q   Was that someone from Scottsdale that told
5  you that?
6          INTERPRETER: Can you repeat that last part
7  for the interpreter, please.
8      Q   Do you think it was someone from Scottsdale
9  that told you that after April 29th, 2003?
10     A   Yes. I received a phone call and also a
11 letter, but I don't -- I didn't understand everything
12 completely.
13     Q   Did Scottsdale ever send you a letter in Thai
14 language explaining the insurance coverage?
15     A   No, never, because I never told them that I
16 was from Thailand.
17     Q   You mentioned the Honda being totaled. Were
18 you driving it?
19     A   Yes. It was a total loss.
20         MR. CALL: Were you driving it?
21         THE WITNESS (in English): Yes.
22 BY MR. SCHLEHOFER:
23     Q   You mentioned the check was made payable to
24 you and to Songpol?
25     A   Yes, I'm 99 percent sure, because I remember

Page 34

1  sending -- signing some documents and send it back to
2  the company.
3          The check was sent in my name and Songpol's
4  name. And because I cannot deposit that, because I
5  need to send it -- so I send it to Songpol and ask him
6  to sign on the back of the check, and also made a copy
7  of his identification card and send it back to me.
8  And so the check was deposited in my bank, Wells Fargo
9  Bank.
10     Q   Was the title to the Honda still in Songpol's
11 name on April 29th, 2003?
12         INTERPRETER: Can you repeat that for the
13 interpreter? I didn't hear it very clearly.
14     Q   Was the title to the Honda still in Songpol's
15 name on April 29th, 2003?
16     A   Yes, that's correct.
17     Q   Do you have a chauffeur's license to drive a
18 taxicab?
19     A   Again, I had to go to the Department of Motor
20 Vehicles and apply for the license. They did a
21 physical examination on me, they did some -- they
22 check my criminal record and they also check my
23 driving history. And I usually renew my license every
24 year. I pay about $200 per year.
25     Q   So you need a chauffeur's license to drive a

Page 35

1  taxicab in Barrow; is that right?
2      A   Yes. It is required. Especially here in
3  Barrow, because it's a small town and there is a taxi
4  committee composed of about five people. And there's
5  a taxicab -- director of taxicab and also -- so the
6  permit or the license has to be renewed every year.
7      Q   Did you know, before April 29th, 2003, that
8  other taxicab drivers in Barrow had given a reduced
9  taxicab rate to Mrs. Skipper?
10         INTERPRETER: Can you say the name of the
11 customer again?
12         MR. SCHLEHOFER: Mrs. Skipper.
13         MR. CALL: Why don't we just call her "the
14 customer."
15     A   No. Because according to the rule, we cannot
16 allow or we cannot give a discount, a personal
17 discount, to customers, because there are about five
18 taxicab companies here in Barrow. And if one company
19 can discount to a customer, other taxicab companies
20 can make a complaint to that company. And if they
21 increase the price, then the customers have the right
22 to report that to the City Hall. And in the past,
23 there were some issues in regards to raising price and
24 giving discounts, and so they made a rule to settle
25 that.

Page 36

1  BY MR. SCHLEHOFER:
2     Q   Do you know other taxicab drivers who had
3  given Mrs. Skipper a senior rate?
4     A   For the $3, she paid momentarily. But even
5  if she pay the senior rate, it would be $7. But she
6  only pay $5, so she's still trying to pay below the
7  senior rate.
8     Q   My question is: Have you talked to other
9  taxicab drivers, where they have charged Mrs. Skipper
10 a senior rate?
11    A   Yes.
12    Q   And did you talk to those taxicab drivers
13 before or after April 29th, 2003?
14    A   Yes. But it's not that they give her a
15 discount. It was just that she paid an amount, and
16 some of them did not want to bother with her, with it,
17 so they just, you know, let it go.
18        And so we talk here and there, we talk like
19 when we get together, we talk about those kinds of
20 things, and it was just a known thing.
21    Q   Were these talks before April 29th, 2003?
22    A   No, not -- I never intend to talk about it.
23 I just heard, you know, that she pay $3.
24    Q   Did you hear this before April 29th, 2003?
25    A   Not that I heard it, but in the past, in the

Page 37

1  past, I picked up the customer before. And if she
2  goes one, she pay $3. And if her husband goes, then
3  it'll be $4. And I didn't really mind a couple times
4  before.
5        And I heard from my conversation with
6  friends -- we just talk, just, you know, asking how
7  the day goes -- and some had mentioned things like
8  that, how she pays very low.
9     Q   So were these conversations with friends
10 before April 29th, 2003? That's all I want to know.
11    A   Yes. Because from the past, friends -- she
12 had called in to complain, to make a complaint to
13 other drivers as well, that they charge her full rate
14 when it is only a local call -- local service. So
15 it's just a known thing.
16    Q   Have you heard that there are other
17 passengers who had complained about you before?
18    A   No.
19    Q   Did you hear any rumors that people had
20 complained about -- passengers had complained about
21 your service before?
22    A   No, never.
23    Q   When you were talking to your friends about
24 Mrs. Skipper, who are you -- can you give me the names
25 of your friends, please.

Page 38

1     A   Many of my taxi driver friends are -- one has
2  gone -- has gone to Thailand, and two have died, and
3  one other driver has gone out of the town, lives
4  somewhere else. And none of them are driving taxi
5  anymore.
6        But, you know, when I say they called in to
7  make complaints, usually in our taxicab, there's a
8  radio that, when somebody call in, we can hear them
9  from our taxicab, from the radio within the taxicab.
10 So everybody hears pretty much everything.
11    Q   Do any of those friends still live in Barrow?
12    A   I have some friends from other taxicab
13 companies, but I don't know -- nobody remember the
14 story of what happen three years ago. It's too long.
15 Just a minor thing and it was too long ago, and nobody
16 remembers those incidents -- those events.
17    Q   Did any of your taxicab friends help you type
18 Exhibit 2?
19    A   No. But he does not want to reveal -- he
20 does not want me to reveal his name.
21    Q   Is it your position that there is some
22 miscommunication in Exhibit 2?
23        MR. CALL: Objection to the form of the
24 question. I don't think you've established she could
25 even read Exhibit 3 -- Exhibit 2.

Page 39

1  BY MR. SCHLEHOFER:
2     Q   Go ahead.
3     A   Yes. Because the person who helped me type
4  the letter is not a taxi driver, and he -- the person
5  does not know much about taxi and things like that.
6  And so we did not sit down and talk over it. We were
7  too busy to do that.
8     Q   So you think your friend typed part of this
9  up wrong?
10        INTERPRETER: Can you repeat that for the
11 interpreter?
12    Q   Do you think your friend misunderstood you
13 when he or she typed up Exhibit 2?
14    A   Like I explained or answered before to the
15 other attorney, it's that most of everything, pretty
16 much everything is correct, except the three points I
17 mentioned.
18        First, the $5 that I received, and the letter
19 said I did not.
20        The second thing is the round-trip situation.
21 My friend did not know how to explain that.
22        And the third thing is the purse, the wallet
23 that I found. It was outside of the car.
24        Those were the three that were not accurate.
25    Q   This is not a question, it's just a statement

Page 40

1  to you. And your attorney can talk to you. But under
2  Alaska law, there is no privilege for witnesses.
3         MR. SCHLEHOFER: Go ahead.
4         INTERPRETER: Can you repeat that for the
5  interpreter? I didn't hear some part of your
6  statement.
7         MR. SCHLEHOFER: Sure.
8  BY MR. SCHLEHOFER:
9     Q   This is not a question to you, this is a
10  statement. And you can talk to your attorney. But
11  under Alaska law, people have to disclose the names of
12  witnesses. So I will ask you the question, and you
13  can talk to your attorney.
14         But I would like to know who the name of your
15  friend is that helped, that typed this up.
16         INTERPRETER: Did you say that it was under
17  Alaska law that a witness name need to be -- need to
18  be revealed?
19         MR. SCHLEHOFER: Correct, yeah. And Mr. Call
20  can disagree with me if he wants, or you can go off
21  record, if you want, and talk to your client.
22         MR. CALL: It is our position that because
23  Ms. Skipper threatened to have Usanee banished from
24  Barrow, we're not going to -- I'm not instructing my
25  client to answer that question.

Page 41

1         If you wish to file a motion with the court
2  and have the court compel her to tell you who typed
3  this up, that's fine.
4         MR. SCHLEHOFER: Okay.
5         MR. CALL: But I'm not subjecting other
6  residents of Barrow to your client's continued threats
7  to have them banished from town.
8         MR. SCHLEHOFER: This is not for you.
9         You have a duty, if you don't want to have
10  her answer this, to move for a protective order. I
11  will tell you, Blake -- and you can think about it, if
12  you want -- but if we move for this, we're going to
13  want another deposition, you will pay all the costs of
14  flying down here, you'll pay for the court reporter,
15  you'll pay for the translator, everything. So you can
16  think about it.
17         MR. CALL: Yes. And I've thought about it.
18  And knowing Judge Jeffery, good luck in convincing
19  Judge Jeffery that it has any relevance to anything.
20  But you want you want. I don't care.
21         MR. SCHLEHOFER: This is a deposition in a
22  federal action.
23         MR. CALL: I don't care. I'm not instructing
24  my client to answer. She has told you her friend does
25  not want her to answer. That's where it is.

Page 42

1         MR. SCHLEHOFER: Right. And she's claiming
2  there's a miscommunication with her friend. There's
3  no privilege under Alaska law. You have a duty to
4  move for a protective order. So if you lose on this,
5  we're going to be asking for all our time, the cost of
6  the court reporter and the translator. So if you want
7  to take that risk, when you know how liberal discovery
8  depositions are, that's fine.
9         MR. CALL: Why don't you ask her questions
10  about what's mistaken in that? What does the -- I
11  guess I don't understand what the identity of the
12  typist has to do with anything, when the client is
13  here to answer your question.
14         MR. SCHLEHOFER: It presumes that she is
15  correct and the typist is wrong, okay? We have a
16  right to find out who the typist is, what she said to
17  the typist, because this a very detailed report. Were
18  more than one draft done, several drafts, et cetera.
19  It could lead to a whole host of information. And we
20  do not have to rely on the credibility of your client
21  solely.
22         Okay. We can forget about that subject.
23  We'll go on to the rest.
24         MR. CALL: And I would note for the record
25  that I'm not the attorney of record in this matter

Page 43

1  either. And you're telling me I need to instruct her
2  to something. Well, thank you for your opinion, but
3  I'm not a party to this case.
4         MR. SCHLEHOFER: Okay. Well, then I guess
5  she would have to bear the cost, then.
6         MR. CALL: As she did to fly down here on her
7  own nickel.
8  BY MR. SCHLEHOFER:
9     Q   Now, this dispute that you had with
10  Mrs. Skipper on April 29th, 2003 is all connected with
11  your job as a taxicab driver; is that correct?
12     A   Yes, correct.
13     Q   And the discussions about the fare, that all
14  took place in the taxicab; is that correct?
15         INTERPRETER: Can you say that again? I
16  couldn't hear very well.
17     Q   The discussions that you had with
18  Mrs. Skipper about the fare, did all those discussions
19  take place in the taxicab?
20     A   Yes, correct.
21     Q   Did any discussions take place outside the
22  taxicab?
23     A   No.
24     Q   In the past, have you ever helped passengers
25  with luggage?


Exhibit 2
Page 13 of 17

Page 44
1  A  Yes. Because it's part of my responsibility.
2  But many times if the customer is a male, then pretty
3  much he can help himself.
4  Q  And so you've helped customers with their
5  property that's in the taxicab; is that right?
6  A  Yes, correct.
7  Q  And was the taxicab engine still running when
8  you had these conversations with Mrs. Skipper on April
9  29th, 2003?
10  A  Yes. The car was going slowly.
11  Q  Did you ever turn off the engine in this
12  incident with Mrs. Skipper on April 29th, 2003?
13  A  No, I did not.
14  Q  Do you know what hand Mrs. Skipper was
15  holding the fishing pole with?
16      INTERPRETER: Can you repeat that for the
17  interpreter, please?
18  Q  Do you know what hand Mrs. Skipper was
19  holding her fishing pole with?
20      MR. CALL: Objection. Vague as to time.
21  A  I believe it was her left hand, because the
22  fishing pole was right between myself and the customer
23  in the front.
24  BY MR. SCHLEHOFER:
25  Q  Could you be mistaken about which hand she

Page 45
1  was using?
2  A  I don't know, because it's been three years.
3  But it should be the left hand, because the fishing
4  rod was on her left, on her left side, by her left
5  hand.
6  Q  Where you're sitting, was the fishing pole
7  between the driver --
8      THE WITNESS: (Indicating.)
9      INTERPRETER: Can you repeat that again,
10  please?
11      MR. SCHLEHOFER: Yeah, I'm sorry.
12  BY MR. SCHLEHOFER:
13  Q  The fishing pole was between your right hand
14  and her left hand, where she was sitting; is that
15  correct?
16  A  Yes, correct.
17  Q  Do you know if she used her left hand to grab
18  the fishing pole, or if she reached over with her
19  right hand, or you don't know?
20  A  I want to show you here. I believe it's the
21  left hand, but I can show you here.
22      THE WITNESS (in English): You like to see?
23  BY MR. SCHLEHOFER:
24  Q  Okay. We don't have a videotape. So do you
25  think she took her left hand and went --

Page 46
1  A  (In English) Example: This is my -- I'm
2  driving. And this is left-hand side and right-hand
3  side, and keep driving. And the fishing pole is here
4  between --
5  Q  Well, you're driving, right?
6  A  (In English) Yeah, I'm driving.
7  Q  Well, the passenger is over there --
8  A  (In English) The passenger here
9  [indicating].
10  Q  Oh, okay, he's driving [indicating].
11  A  (In English) He driving. And the passenger
12  here, and the fishing rod here [indicating].
13  Q  Okay.
14  A  (In English) Yeah. And she open the door --
15  click -- and I grab her left hand, yeah, like this
16  [indicating]. And I put my right hand to put it here
17  and park the car. And then she grab the fishing rod
18  here, and I grab it on the top, that's it. And she
19  open the door and walk away. And she slam the door
20  really, really loud.
21  Q  Okay. Do you know if Mrs. Skipper is
22  right-handed or left-handed?
23  A  I don't know. I didn't pay attention to
24  that.
25  Q  Did you hold on to the pole because you

Page 47
1  wanted to get paid for your fare?
2  A  No. Because I know that if that's the case,
3  then if she calls to the City Hall, then I will get
4  into big trouble. For that reason, that is the reason
5  why I immediately seek the help of the officer, of the
6  police officer.
7  Q  So you agree that it's not right to hold on
8  to a fishing pole in order to get paid; is that right?
9      MR. CALL: Objection to the form of the
10  question. It calls for a legal conclusion.
11  BY MR. SCHLEHOFER:
12  Q  Go ahead. In your mind --
13  A  Yes, I know that, and that's why I went to
14  the officer. And I don't know if the customer was
15  confused. She looked at me and then just walked out
16  and slammed the door.
17  Q  So at that time, April 29th, 2003, it was
18  your personal belief that you couldn't hold on to the
19  customer's property to collect a taxi fare?
20      MR. SANDBERG: Form.
21  A  Yes, I do. And for that reason, she may have
22  misunderstood me. I want to make it clear to her in
23  regards to the rate. That's why I went and seek the
24  help of the police officer, so he could help me
25  explain to her. Otherwise, I know that I could have

14 (Pages 44 to 47)


Exhibit 2
Page 14 of 17

Page 48
1  been -- she could report me to the police or to the
2  City Hall, and I could have been in bigger trouble.
3     And usually in the city, in Barrow, there is
4  a taxicab committee which compose of five people. And
5  if any of the taxi drivers is involved or has a
6  problem with a customer, usually the committee would
7  request the appearance of that taxi driver, and that
8  taxi driver would have to explain the situation to the
9  committee. Usually that's the procedure.
10    But in this case, the customer did not
11 request for that; rather, I received a letter from the
12 attorney instead.
13    MR. SCHLEHOFER: Okay.
14    And then you have an objection to form.
15 What's that, so I can cure it?
16    MR. SANDBERG: I thought you were assuming
17 facts not in evidence that she had an opinion that it
18 was appropriate to retain personal property.
19    MR. CALL: Can we go off record?
20    MR. SCHLEHOFER: Yes, let's do that.
21    (Off the record.)
22    MR. CALL: Back on record.
23    My client underlined one section, I thought.
24    MR. SCHLEHOFER: On page 2.
25    MR. CALL: On page 2. If we can insert

Page 49
1  something else and swap it for a clean copy, I do not
2  care, but for the record, my client did do an
3  underline on page 2.
4     MR. SCHLEHOFER: Okay. Mark that Exhibit 2,
5  and then we'll just take the other one and we'll
6  substitute this.
7     Is that fine with everybody?
8     MR. SANDBERG: Yes.
9     MR. CALL: So stipulated.
10 BY MR. SCHLEHOFER:
11    Q  Was it your personal belief, in April 2003,
12 that you could not hold on to a customer's property in
13 order to get paid --
14    MR. SCHLEHOFER: Wait. I didn't finish the
15 question. I'm sorry.
16    Just a second, Interpreter -- I'm sorry, I
17 forgot your first name -- but I didn't finish the
18 question. Let me do the question again, okay?
19    INTERPRETER: Okay.
20 BY MR. SCHLEHOFER:
21    Q  Was it your personal belief in April of 2003
22 that you could not hold on to a customer's property to
23 get paid for a taxicab fare?
24    A  Yes, I do.
25    Q  Did you hold -- did you yank the pole or jerk

Page 50
1  the pole from Ms. Skipper on April 29th, 2003 while
2  she was holding on to it?
3     INTERPRETER: Can you repeat that for the
4  interpreter, please?
5     MR. SCHLEHOFER: Yes.
6  BY MR. SCHLEHOFER:
7     Q  Did you yank the fishing pole or jerk the
8  fishing pole while Mrs. Skipper was holding it on
9  April 29th, 2003?
10    A  No. Because the fishing pole was still
11 sitting on the -- still sitting in between the seats.
12 The heavier end, the bigger and heavier end, was still
13 on the floor of the vehicle, and the tip of it was
14 very small. It was about only probably 1.5 meter
15 long. And I did not yank it from her.
16    Q  Did you see anything that happened to
17 Mrs. Skipper in the taxicab that could have caused her
18 to injure her shoulder?
19    A  No, I didn't see anything. The only thing
20 that I could think of was probably when she was
21 probably outside of the car and she slammed the door
22 really hard. And it seemed that she was okay, even up
23 to the point where the police officer came and talked
24 to her.
25    Q  What did you see when -- did you see her

Page 51
1  close the door?
2     A  Yes, I did.
3     Q  Do you know if she closed it with her hand or
4  she closed it with her body?
5     A  I don't know what she used, but usually
6  people use their hands to shut the door.
7     Q  Have you heard from anyone else that
8  Mrs. Skipper may have injured her shoulder?
9     A  No, never.
10    Q  Did you ever hear that Mrs. Skipper had
11 bruises on her shoulder? Did you ever hear that from
12 anybody?
13    A  No. But the next day, like I said, about
14 around 12:00 or 1:00, the taxicab director from the
15 City Hall called me and made a complaint to me. And
16 he told me that the customer went to the doctor that
17 same day, and that her shoulder is bruised and turning
18 blue or green.
19    Q  And who is the director?
20    A  At that time, the director's name is --
21    THE WITNESS (in English): The name
22 [indicating].
23    A  His name is Gwen, but I don't remember her
24 last name.
25    MR. CALL: For the record, she's just noting


Exhibit 2
Page 15 of 17

Page 52

1  that in the disclosure is a letter from the director
2  of the taxi.
3  BY MR. SCHLEHOFER:
4    Q  Can you explain if there's anything that
5  happened in the taxicab that would explain why
6  Mrs. Skipper would leave the taxicab without the
7  fishing pole?
8    A  In my opinion, probably she was upset that I
9  was charging -- I was telling her that the regular
10 price was $11.  But she told me she had been paying $3
11 for a long time, and so she gave me five.  And she was
12 probably wanting to give me more trouble by calling
13 the City Hall and make a complaint, and to try to
14 expel or chase me out of the city, of the town.
15      But, you know, at the end, I even said, "Oh,
16 $5.  Okay, then.  That's fine with me.  That's fine,
17 that's fine," but then she still refused to listen.
18 And because when we were in the car talking, our
19 voices were loud, and so it was almost like arguing.
20   Q  Did you ever take any actions in the taxicab
21 to hurt Mrs. Skipper on purpose?
22   A  No.
23   Q  Assuming she was hurt, it would be your
24 position that it was -- strike that.  Never mind.
25   A  It was just an argument that we had.

Page 53

1    Q  After Mrs. Skipper left the cab, did you ever
2  want to keep the pole so that you could get paid?
3    A  Not at all, because I know that if I keep it,
4  it's against the law.  And I thought that if there was
5  no police there at that time nearby, I would have
6  called 911 or some police station, because from my
7  taxicab, I can call, dial to a police station, and in
8  five minutes they will show up.
9      THE WITNESS (in English):  One second.
10     MR. SCHLEHOFER:  Go ahead.
11   A  And I did not call the police, or I didn't --
12 strike that.
13     The reason I called the police was because I
14 did not know how I would return this fishing pole to
15 her, because I was afraid that if I go and return it
16 to her, she might not respond or she might not -- she
17 might not be open to me.  So I seek the help of the
18 officer.
19   Q  So the officer gave the fishing pole back to
20 Mrs. Skipper, not you; is that correct?
21   A  I was the one that was giving it to her, but
22 the police officer was also there.
23   Q  Do you know how much the fishing pole was
24 worth; can you estimate?
25   A  I don't know.

Page 54

1    Q  The trip that you took with Mrs. Skipper,
2  would some taxicab drivers -- let me back up.
3      The trip that you took with Mrs. Skipper,
4  would that always be considered a round-trip, or could
5  that be considered a one-way trip also?
6      INTERPRETER:  Can you repeat that for the
7  interpreter?
8      MR. SCHLEHOFER:  Yeah.
9  BY MR. SCHLEHOFER:
10   Q  With regard to the trip that you took with
11 Mrs. Skipper, would that be a round-trip, or could
12 that also be considered a one-way trip?
13   A  For sure it was a round-trip with one stop.
14 But that day, even if I was not the driver of the
15 taxi, she may have done that to other taxi drivers,
16 and they would probably just let it go, without
17 arguing with her.
18   Q  In your experience as a taxicab driver, and
19 talking with friends who are taxicab drivers, would
20 some taxicab drivers consider the trip you took a
21 one-way trip?
22   A  A hundred percent, it was not a one-way, it
23 was a round-trip.  That route there is considered a
24 round-trip.  It usually is a round-trip.  It's a
25 round-trip.

Page 55

1    Q  Did Mrs. Skipper offer to show you her ID?
2    A  She did not.  Usually she probably pay $3.
3  That day, even for the senior citizen's discount, it's
4  $2 short.
5      MR. CALL:  Usanee -- Translator, please
6  translate this -- the question was, did she try to
7  show you her ID?
8      THE WITNESS:  No, not on that day.
9  BY MR. SCHLEHOFER:
10   Q  Did you ever ask to see her ID?
11   A  No, I did not.
12     MR. SCHLEHOFER:  Why don't we go off record.
13     (Off the record.)
14     MR. SCHLEHOFER:  Back on record.
15 BY MR. SCHLEHOFER:
16   Q  You mentioned that you had a conversation
17 with Gwen, the taxicab director?
18   A  (In English) Yes.
19   Q  What did she say to you?
20   A  Gwen is a new director for that -- for the
21 city.  And when she called me in, she just said -- she
22 told me that there was a senior citizen and that I
23 hurt her, caused her to have pain on the shoulder, and
24 so on and so forth.  I basically did not say anything.
25 She talk, talk, talk.  And at that time, she was just

Page 56

1  a new director.
2    Q   And then is this the conversation where she
3  gave you a warning, then?
4    A   I almost say something to her, but she say,
5  "Don't say anything. If you want to say something,
6  just go and talk to the mayor." So I just kept quiet.
7    Q   Did you talk to the mayor?
8    A   No, I did not.
9    Q   Did you talk to anyone else, after you talked
10 to the taxicab director, about this incident?
11   A   No. I just talked to my co-taxi drivers,
12 co-workers, and just didn't say much.
13   Q   Did you hear about any passenger complaints
14 about you from the Taxicab Commission, besides this
15 April 29th, 2003 incident?
16       INTERPRETER: Can you repeat that for the
17 interpreter, please?
18       MR. SCHLEHOFER: Yes.
19 BY MR. SCHLEHOFER:
20   Q   Did you hear about any other passenger
21 complaints about you from the Taxicab Commission,
22 besides this April 29th, 2003 incident?
23   A   No.
24   Q   And I think you already said you did not hear
25 about any passenger complaints about you as a taxicab

Page 57

1  driver from anybody else; is that right?
2    A   No, because if there was, I would be called
3  into the office right away.
4        MR. SCHLEHOFER: No further questions.
5        MR. SANDBERG: I have no further questions.
6  I believe we're done.
7        (Proceedings concluded at 12:17 P.M.)
8        (Signature waived.)
9              -oOo-
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25